### HOLMAN et al. v. TJOSEVIG et al.

(First Division. Juneau. September 9, 1922.)

No. 1876–A.

*(Syllabus by Editorial Staff.)*

**1. Trusts ☞366(2)—Parties Plaintiff—Joint Interest.**

Under Comp. Laws Alaska 1913, §§ 1195, 1196, permitting joinder as plaintiffs of parties having an interest in the subject, and requiring joinder of those united in interest, joinder of several tenants in common, seeking to establish a trust in a fund which they alleged arose from a sale of the entire property by other cotenants, was not ground for dismissing the suit.

**2. Trusts ☞105—Joint Property—Sale—Delivery.**

No. trust arose in favor of tenants in common in a fund paid to cotenants on an alleged sale of the entire property, where the sale was forfeited by vendee's failure to make further payments and the property was not delivered.

**3. Tenancy in Common ☞35—Sale by Cotenant.**

A sale by a tenant in common to a third party passes only the interest of the seller, and does not affect the rights of cotenants.

**4. Trusts ☞105—Sale by Cotenant—Proceeds.**

Since a sale of mining properties by some of the tenants in common, though purporting to be of the entire property. passed only their interests, no trust in the proceeds arose as to nonparticipating cotenants, especially where the sellers had

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

attempted to forfeit the interests of the nonparticipants for failure to do assessment work, and were holding adversely, rather than in any contractual or representative capacity.

**5. Trusts ⊚⇒105—Sale of Common Property—Equitable Interest.**

Where a part owner of mining properties had exchanged fractional interests with an owner of other mines, without formal transfers, but had acknowledged the equitable interest created thereby, in options to others, on sale of the entire properties by such part owner and other cotenants, the proceeds were impressed with a trust for the proportionate amount of such equitable interest.

**6. Vendor and Purchaser ⊚⇒231(16)—Mining Property—Equitable Interests—Notice to Purchaser.**

Where the owner of an equitable interest in mining claims assigned to his wife by properly recorded deed, and the co-owners had no power of attorney or authority as to such interest, a buyer of the entire properties from them was not a bona fide purchaser as to the equitable estate.

**7. Tenancy in Common ⊚⇒35—Sale—Ratification.**

Tenant in common *held* to have sufficiently confirmed a sale by cotenants, so as to be entitled to share in proceeds, a suit by her asserting her interest in the property having been dismissed, and she having joined in a suit expressly ratifying the sale, and asking that a trust in the proceeds be decreed in her favor.

**8. Mines and Minerals ⊚⇒38(5)—Actions—Laches.**

Claimant of interest in mining claims, asserting right to share in proceeds of sale, *held* barred by laches as to a defendant who had been held liable to other claimants in former litigation, in which claimant might have asserted her rights.

**9. Judgment ⊚⇒743(1)—Title—Res Judicata—Identity of Issues.**

Claimant of an interest in proceeds of sale of mining properties was not concluded by the judgment in former litigation concerning the proceeds, wherein claimant's husband and others intervened for the purpose of continuing an injunction against disposal of the moneys, and no issue was tendered on the merits of claimant's rights.

**10. Trusts ⊚⇒352, 372(1)—Commingling of Funds—Burden of Proof.**

Where a trustee so mingles the trust fund or property with his own, or so invests it in property with his own, that the trust fund or property cannot be separated or ascertained, the whole mixed fund or property becomes subject to the trust, except so far as the trustee may be able to distinguish or separate his own fund or property; the burden of such distinction or separation being on the trustee.

⊚⇒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**11. Banks and Banking ⬅➡136—Lien.**

Ordinarily a banker's lien on the moneys and securities deposited in the usual course of business, for advances that are supposed to be made on their credit, attaches against, not only the customer, but the unknown equities of all others in interest, unless it be modified or waived by some agreement, express or implied, or by conduct inconsistent with its assertion; but it cannot prevail against the equities of the beneficial owners of which the banker had actual or constructive notice.

**12. Banks and Banking ⬅➡136—Lien on Funds—Evidence.**

A bank, which on sale of mining properties to a purchasing corporation, because trustee as to receipt of money and distribution of shares of stock in the purchasing corporation, *held*, in view of the evidence, to have no lien on funds received, being chargeable with constructive notice of the rights of a claimant to beneficial interest.

R. E. Robertson, of Juneau, for plaintiffs.

James Wickersham, of Juneau, for defendants.

Hellenthal & Hellenthal, of Juneau, for First Bank of Cordova.

REED, District Judge. The plaintiffs, claiming to be tenants in common with defendants in certain mining claims, by this action are seeking to impose a trust on the proceeds of the sale by defendants of the whole of the common property proportionate to their claim of interest in such property. The facts in the case in some respects are similar to those involved in the case of Donohoe and Smith against the defendants, decided by the appellate court and reported in 262 Fed. at page 911, and not a little of the record and testimony of that case has been incorporated in this. Certain facts based upon the same record and adjudicated in that case must be conclusive in this. But there are certain differences in the two actions, which I will endeavor to point out in the course of this review as the bases for my conclusions herein.

The main conceded facts, as shown by the testimony and records, may be chronologically stated as follows:

On April 6, 1911, a decree was rendered by Judge Cushman, then judge of the district court for the third division of Alaska, in an action therein pending wherein Nels Tjosevig was plaintiff and Christian Tjosevig and Eli Tjosevig, his wife, and Andrew Halvorsen were defendants, and Gust Djarf and

Charles Garwood were interveners. This decree quieted the title to the certain lode mining claims described as the Tjosevigs Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15, and the Charlotte, Teddy, Nebraska, and Norway No. 2, situated in the Valdez recording district, Third division, of the territory of Alaska.

By this decree it was adjudged that the title to an undivided $21\frac{1}{2}/48$ of all of said claims was vested in the plaintiff Nels Tjosevig, that the title to an undivided $21\frac{1}{2}/48$ was vested in defendant Christian Tjosevig, that title to an undivided $1/48$ of said claims was vested in the intervener Gust Djarf, and that title to an undivided $1/48$ interest was vested in intervener Charles Garwood; that the title to all of the Dagny Marie and Carbonate Hill lode claims (except such portions thereof as conflicted with Tjosevig No. 3 and Nebraska lode claims), and the title to all of the New York lode claim (except such portions as conflicted with the Charlotte and Teddy lode claims), was vested in Eli Tjosevig; and that all portions of the Dagny Marie, Carbonate Hill, and New York lode claims so conflicting were void and of no effect. By this decree $45/48$ of the above-mentioned lode claims were settled and determined by the court, leaving $3/48$ undetermined. No appeal was taken from this decree, and the same became final, and the title of the several parties to the $45/48$ of the mining claims therein described became fixed as in said decree declared as of the date thereof.

The $3/48$, the title to which was not mentioned in said decree, was originally vested in Andrew Holman, John Ekemo, and George C. Hazelet. This appears, not only from the testimony introduced by the plaintiffs, but also from the testimony of the defendant Tjosevig himself.

On July 1, 1911, Christian Tjosevig, as attorney in fact for Andrew Holman, John Ekemo, and George C. Hazelet, executed a deed of the above-named $3/48$ to one Andrew Halvorsen, one of the defendants in this case.

In March of the year 1914 Christian Tjosevig and Eli Tjosevig attempted to advertise out the plaintiffs Gust Djarf and Charles Garwood under section 2324 of the Revised Statutes of the United States (U. S. Comp. St. § 4620), providing for forfeiture of noncontributing co-owners to the annual assessment work required by such section. On the trial of the

case of Donohoe and Smith against the defendants herein, the notice of forfeiture was declared by Judge Jennings to be insufficient to constitute a notice of forfeiture. This finding of Judge Jennings was not assigned as a ground of error by the appellate court, and was apparently abandoned by the defendants in that case on appeal. See Tjosevig et al. v. Donohoe et al., 262 Fed. 911.

On April 6, 1916, Christian. Tjosevig, Eli Tjosevig, his wife, Andrew Halvorsen, and Nels Tjosevig entered into an agreement with one George Francis Rowe to sell to him, the said Rowe, all the Tjosevig claims (Nos. 1 to 15, both inclusive), and the Norway (No. 2), Nebraska, Charlotte, Contact, Carbonate Hill, Dagny Marie lodes and the Consolidated placer mining claim for $150,000 and certain shares of the stock in a corporation thereafter to be formed. Of said consideration, $100,000 was to be paid to Christian and Eli Tjosevig and Andrew Halvorsen at the times in said contract or agreement stated, and $50,000 was to be paid at different periods therein stated to Nels Tjosevig. Four thousand dollars appears to have been paid at the signing of the agreement, $3,000 of which went to Christian Tjosevig and $1,000 to Nels Tjosevig. This agreement further provided that the whole of said claims (being all interests) should be sold to the purchaser. This agreement became forfeited by the failure of the vendee to comply with its terms as to payment.

On June 6, 1916, Christian Tjosevig, Eli Tjosevig, his wife, and Andrew Halvorsen, as first parties, entered into an agreement with the Tjosevig-Kennecott Copper Company, a corporation, as second party. This agreement, in effect, set forth that first parties are the owners of the Tjosevigs Nos. 1 to 15, inclusive, Nebraska, Norway No. 2, Charlotte, Contact, Carbonate Hill, and Dagny Marie lode mining claims, and the Consolidated placer claim, and that in consideration of a deed of all the right, title, and interest of first parties therein, second party agrees: (1) To limit its capitalization to 2,500,000 shares of stock, of a par value of $1 each; (2) to deliver 2,499,995 shares of its capital stock to the Scandinavian-American Bank, made out to the First Bank of Cordova as trustee and as owner; (3) to make the sale of its capital stock at certain prices not less than the prices in said agreement specified; (4) to pay the money received from sales of stock to the Scan-

dinavian-American Bank of Seattle upon receipt of properly assigned stock transfers of the shares issued to the trustee, the First Bank of Cordova; (5) to assent to the transfer of $117,000 of the first money received from such sales to the First Bank of Cordova as trustee for the first parties; (6) to pay to the Scandinavian-American Bank at least certain amounts of money at certain stated times therein specified; (7) to pay certain costs pertaining to the transfer, and (8) to do the annual assessment work on the claims and record the same, and to give a bond indemnifying the first parties against incumbering or alienating any of the property described.

The first parties therein agreed to the delivery of the 2,499,-995 shares of stock to the Scandinavian-American Bank for the First Bank of Cordova as trustee; to instruct the trustee to deliver such of the shares as may be sold to the party purchasing the same, upon the request of George Francis Rowe, and the payment of the price designated in the agreement; that $2,000 of the first moneys from such stock sales should be paid to Nels Tjosevig; to instruct the First Bank of Cordova to deliver to Christian Tjosevig a certificate for 125,000 shares of the capital stock of the company, and to Nels Tjosevig a certificate for 10,000 shares; and to deliver the unsold shares of stock (less the 135,000 shares delivered to the Tjosevigs) to the second party when Christian Tjosevig shall have received $117,000 and Nels Tjosevig shall have received $58,000 under an agreement concurrently executed. There were further provisions relative to forfeiture and annual assessment work under section 2324 of the Revised Statutes of the United States, and right of entry and mining of the property, not material to this controversy.

On the same date, and concurrently with the above agreement, a similar agreement in many respects appears to have been made by Nels Tjosevig with the Copper Company for his interest.

Concurrently with the two above agreements, on June 6, 1916, Christian Tjosevig, Eli Tjosevig, Andrew Halvorsen, and Nels Tjosevig executed a deed to the Tjosevig-Kennecott Copper Company, selling and conveying and quitclaiming to the Copper Company all their right, title, and interest in and to the mining claims mentioned and described in the agree-

ment. This deed was recorded on October 9, 1916, in the records of the Chitina recording district, Alaska.

The above-quoted agreement of June 6, 1916, was on July 29, 1916, modified in certain particulars as to the amount and times of payment for the stock and in reference to the indemnity bond, but otherwise remained the same.

By agreement between Christian Tjosevig, Eli Tjosevig, Andrew Halvorsen, Nels Tjosevig, and the First Bank of Cordova, dated June 6, 1916, and executed contemporaneously with the first above mentioned agreement between the Tjosevigs and Halvorsen and the Kennecott Copper Company, it was agreed that, whereas, the first parties have sold a certain mining property to the Tjosevig-Kennecott Copper Company, and the Copper Company is to exploit and develop the same; and whereas, under the terms of two other agreements the first parties, on delivery of the deed to the company, are to receive from the company stock certificates for 2,499,995 shares in said company through the First Bank of Cordova as trustee, and an indemnity bond to secure the first parties against any loss of their property, except under conditions prescribed between the company and the first parties; and whereas, the first parties have instructed the Copper Company to issue the stock certificate to the bank as trustee: The first parties therefore have authorized the second party through its correspondent bank, the Scandinavian-American Bank, to deliver the deed of said mining property on receipt of the shares of stock aforesaid and the indemnity bond; and first parties further authorize the second party to accept said certificate of stock for 2,499,995 shares and hold the same in trust for the first parties on the following conditions: (a) The second party may authorize the Scandinavian-American Bank to transfer the shares to such persons and in such amounts as George Francis Rowe of Seattle may request upon receipt by the Scandinavian-American Bank for the transfer, of certain sums of money. (b) That the first $175,000 of the moneys so received are to be disposed of as follows: (1) The first $2,000 to Nels Tjosevig. (2) All subsequent sums up to $175,000 are to be disposed of as nearly as possible in the ratio of one-third and two-thirds—one-third to be paid Nels Tjosevig until he has received $58,000, and two-thirds to be paid Christian Tjosevig until he has received $117,000.

(c) When the first parties have received the full amount of $175,000, the indemnity bond is to be delivered to the company and canceled, and Christian Tjosevig shall receive a stock certificate for 125,000 shares in the company, and Nels Tjosevig shall receive a stock certificate for 10,000 shares in the company, and the balance of the 2,499,995 shares unsold are to be transferred to the company. In the event of the failure of the company to pay the amounts specified in the instrument executed concurrently with the agreement, the rights of the company to the unsold stock are forfeited, and the second party is instructed to divide the unsold shares in the same ratio as provided for the distribution of moneys by the second party to the first parties; it being understood that the First Bank of Cordova, in agreeing to act as trustee of the first parties, is acting for the benefit and accommodation of the first parties, and is to assume no liability for any acts of omission or of commission by any of the parties.

Under the agreements between the Tjosevigs and the Copper Company, $175,000 was paid into the First Bank of Cordova between the 6th day of June, 1916, and the 29th day of March, 1917; but in the month of September, 1916, an action was commenced in the district court of the third division of Alaska by T. J. Donohoe and Edmund Smith against Christian Tjosevig, Eli Tjosevig, and Andrew Halvorsen and the First Bank of Cordova, in which action the plaintiffs claimed a 7½ per cent. interest in the property sold by defendants to the Copper Company and sought to impose a trust on 7½ per cent. of the consideration received by the defendants Tjosevigs and Halvorsen, and prayed an injunction restraining the bank from paying out any of the funds so received by it as trustee for the defendants. This action was transferred to this division and upon trial, a decree was duly rendered on May 18, 1919, adjudging the defendant Christian Tjosevig trustee for the plaintiffs to the amount of 7½ per cent. of the interest sold by him under the contract of June 6, 1916, and that he was accountable to the plaintiffs for that proportionate part of the consideration received by him. This decree was affirmed by the appellate court on February 2, 1920, in the case of Tjosevig et al. v. Donohoe et al., above referred to. Pending litigation in that case, sufficient of the moneys of the consideration for the conveyance aforesaid was ordered by

the court to be held by the bank to satisfy any judgment the plaintiff might recover. This amount, after considerable controversy, was finally fixed by the court at the sum of $17,000. Of this amount so remaining in the bank, and which was afterwards by an order of the court transferred to the registry of the court, some $12,000 has been disposed of in payment of the judgment rendered in favor of Donohoe and Smith in that case. The balance of the fund, some $5,000, is the fund in controversy in this case.

On September 23, 1918, Andrew Holman, Gust Djarf, and Charles Garwood brought an action against the defendants Christian Tjosevig, Eli Tjosevig, and Andrew Halvorsen claiming an undivided $3/48$ interest in the properties sold by the Tjosevigs and Halvorsen to the Copper Company on June 6, 1916, and sought an accounting from defendants for their proportion of the moneys and property received by the defendants from the sale of plaintiffs' interest in the mining claims described; for judgment for their $3/48$ interest in the money consideration paid the Tjosevigs and Halvorsen and damages for conversion of $3/48$ interest of 125,000 shares of stock received by Christian Tjosevig, and at the same time sought an injunction against the First Bank of Cordova restraining the bank from paying out or disposing of any of the moneys in its possession as trustee received from the sale of said property, and for a final decree of the payment of the balance of such moneys after the settlement of any amount due Donohoe and Smith in the action then pending between Donohoe and Smith and the Tjosevigs. An injunction as prayed for was granted the plaintiffs, restraining the defendants, the Tjosevigs, from withdrawing, and the bank from paying out, any of the moneys referred to, pendente lite. This injunction was granted by the then presiding judge of the Third division, Bunnell, on September 26, 1918, and was served on the First Bank of Cordova on October 4, 1918. Service appears to have been had on the defendants by publication, and on June 9, 1919, the action was transferred to this, the First division of Alaska.

The record from thence on is very voluminous, and is covered with motions and counter motions, some material and some not material to the merits of the action.

On October 1, 1919, the judge of this court, Jennings, or--

dered all funds to the credit of the defendants in the First Bank of Cordova to be paid into the registry of this court, to be held to await the trial of this action and the action of Donohoe and Smith against the Tjosevigs, supra. Thereafter the original injunctional order was modified, so as to permit the defendants, the Tjosevigs, to withdraw the funds from the registry of the court on giving an indemnity bond to satisfy any judgment that might be entered, in lieu of the moneys in the registry.

On July 8, 1920, this court last order was modified, so as to require $3,370 (being the amount of a banker's lien claimed on said funds by the First Bank of Cordova) to be held in the registry of the court.

On October 16, 1919, by leave of court, the plaintiffs filed an amended complaint and therein set forth three causes of action. To this complaint the defendants, the Tjosevigs and Halvorsen, on December 19, 1919, interposed motions to strike and a general demurrer to the first cause of action.

On March 1, 1920, the court sustained the demurrer to the first cause of action of the amended complaint, and on the 16th of March, 1920, the defendants interposed a general demurrer to the second and third causes of action, which, on March 31, the court, through Judge Jennings, overruled. Issues were thereupon joined between the plaintiffs and the defendants on the second and third causes of action of the amended and supplemental complaint. The plaintiffs allege that they are the owners of an undivided $3/48$ interest in the lode mining claims known as the Tjosevigs Nos. 1 to 15, both inclusive, Nebraska, Norway No. 2, Charlotte, Teddy, June No. 2, and also the owner of a $3/48$ interest in the Dagny Marie, Copper Glance, Sadie, Edna, Paul, and New York lode claims in the Chitina recording district, Alaska; that on June 6, 1916, the defendants, Christian Tjosevig, Eli Tjosevig, his wife, and Andrew Halvorsen, were the owners of an undivided $21\frac{1}{2}/48$ interest therein, and no more; that on June 6, 1916, the defendants sold and conveyed to the Tjosevig-Kennecott Copper Company an undivided $24\frac{1}{2}/48$ interest in and to said mining claims (which said interest included the $3/48$ interest owned by the plaintiffs, as well as the $21\frac{1}{2}/48$ interest owned by the defendants) for a consideration of $117,000 in cash and 125,000 shares of the capital stock of said Copper Com-

pany, which consideration so received by defendants is for the interest of plaintiffs, as well as for the interest of defendants, in and to all of said mining claims; that said defendants delivered possession to the said Copper Company of all of said mining claims and every part thereof; that at the time of the said sale, and prior thereto, defendants, with intent to defraud plaintiffs of their rights, disregarded and refused to recognize plaintiffs' rights and interest in said mining claims, and represented to said purchaser that they, the defendants, were the owners of $24\frac{1}{2}/48$ interest in and to said mining claims, including the $3/48$ interest owned by plaintiffs, although they at all times knew plaintiffs were the owners of $3/48$ interest therein; that said defendants, without authority from plaintiffs, and with intent to defraud plaintiffs, received from the Copper Company, not only said defendants' proportion, but also plaintiffs' proportion, of said $117,000, that is $6/49$ thereof, or $14,322.44, of which plaintiffs by reason of their ownership of said $3/48$ interest in said mining claims at all times were and are the owners, but which defendants have retained and appropriated to their own use, and of which facts defendants at all times had full knowledge; that plaintiffs, immediately on learning of the sale aforesaid, ratified said sale and made demand upon defendants for and have claimed from defendants their proportions of said sums so received by defendants and for an accounting, but defendants refuse to comply with said demands. Plaintiffs further state that a large sum of money, being part of the consideration price of the claims aforesaid, is held in the First Bank of Cordova to the credit of the defendants, subject to an injunctional order therein, and injunction in the case of Donohoe et al. v. Tjosevig et al., pending on appeal; but said defendants threaten to and will, unless such injunctions are continued in force, withdraw said moneys and sell the same, and avoid the payment of any judgment plaintiffs may recover.

The third cause of action is for damages for nondelivery of 15,306 shares of the stock of the Tjosevig-Kennecott Copper Company, being $6/49$ of the 125,000 shares, consideration for the sale of the property stated to be received by Christian Tjosevig.

This third cause of action follows generally the tenor of the second cause of action, alleging, however, that the stock was, during the period from December, 1916, to July, 1917, of the market value of $1 per share, and by reason of the failure of the defendants to deliver the same to plaintiffs, plaintiffs were damaged in the sum of $15,306.

The defendants Christian Tjosevig, Eli Tjosevig, and Andrew Halvorsen answered separately, but the material parts of their answers are the same, and practically raise the same issues raised by the answers of Christian Tjosevig. A summary thereof is as follows:

They deny the plaintiffs were the owners of, or entitled to the possession of, an undivided $3/48$ interest in the mining claims mentioned in the complaint as having been sold by defendants, or that plaintiffs had any interest therein, or were entitled to the possession of any part thereof. They affirm that Christian Tjosevig was the owner of a larger interest in some of the claims than $21\frac{1}{2}/48$ and that he shared said interest with Eli Tjosevig and Andrew Halvorsen. They deny that he sold or conveyed any interests in the mining claims to the Copper Company belonging to plaintiffs. They deny any delivery of possession of said mining claims to the Copper Company, except such as may be legally inferred from the delivery of a deed thereto, and deny that the Copper Company took possession of said mining property, or the claims referred to, except such possession as might be inferred from the deed referred to. Further answering, the defendants set up the quitclaim deed hereinbefore referred to between the Tjosevigs and Halvorsen and the Copper Company, and deny any sale of any interest, except as evidenced by that deed. They affirmatively allege that the consideration paid defendants for said deed was for their interest in the property sold, and that no part of said sum was paid for any part of any interest in said claims owned or claimed by the defendants. They then set forth the claim of T. J. Donohoe and Edmund Smith to a 7½ per cent. interest in all the interests of the defendants, and that, pursuant to a judgment and decree of the court, such 7½ per cent. interest so claimed by Donohoe and Smith had been paid out of the $117,000 consideration for the sale above mentioned, and that plaintiffs had at all times knowledge of the claim of said Donohoe and Smith, and

had opportunity to intervene in said action, and are estopped
from claiming said sum so adjudged to Donohoe and Smith
was not due out of said consideration of $117,000. They fur-
ther deny that the plaintiffs ratified the sale as a transfer of
their alleged interest, but, on the contrary, allege that there-
after the plaintiffs claimed their interest in the property de-
scribed was not affected by the sale, and so notified the Cop-
per Company, and that the plaintiffs had not claimed any in-
terest in the consideration for the conveyance.

To the third cause of action, the defendants, after setting
up similar denials and affirmative pleas in the answer as those
set up to the second cause of action, further allege that none
of the capital stock mentioned in the third cause of action
was at any time delivered to the defendants as provided in
the agreement of sale. A plea in abatement was also tendered
in the answer, to the effect that an action was then pending
in the superior court of King county, state of Washington,
wherein the stockholders of the Tjosevig-Kennecott Copper
Company were seeking to vacate the purchase of said proper-
ty by the Copper Company as having been made without au-
thority of the trustees of the company. To this plea in abate-
ment a demurrer was interposed by the plaintiff, and the same
was sustained by the court—Judge Jennings—and in my judg-
ment correctly sustained. Eli Tjosevig and Andrew Halvor-
sen, however, in addition to the general plea set up in Chris-
tian Tjosevig's answer, affirmatively plead that the former is
the sole owner of the Dagny Marie and Carbonate Hill lode
claims, and that Andrew Halvorsen was the owner of an un-
divided $3/48$ interest in some of the claims described in the
deed, and that, pursuant to an agreement made at the time
of the execution of the deed, Halvorsen was to receive $20,-
000 of the consideration for the transfer of his interest.

The reply of the plaintiffs to the several answers of de-
fendants in effect denies all the affirmative matters in the
answers. The First Bank of Cordova also answers the com-
plaint of plaintiffs, setting forth by a cross-complaint a bank-
er's lien on a portion of the money deposited in the bank.
The effect of the pleading of the First Bank of Cordova will
be discussed further on herein.

Up to November 13, 1920, the case was carried on in the
name of Andrew Holman, Gust Djarf, and Charles Garwood

as plaintiffs, but on the last-named date an order was entered by the court substituting Fannie Holman as party plaintiff instead of Andrew Holman, over the objection of defendants.

The theory of the plaintiffs, as evidenced by their amended and supplemental complaint, is that a constructive trust should be imposed on the consideration received by the defendants for the sale of the mining claims referred to in the complaint to the extent of plaintiffs' interest in such mining claims.

This theory is based upon the premise that the sale was made fraudulently by the defendants, who were cotenants with the plaintiffs, in disposing of plaintiffs' interests in such realty without authority of the plaintiffs, and that the remedy thereupon lay with the plaintiffs to ratify the sale and hold the vendor as trustee for their proportion of the consideration; and herein the plaintiffs, having elected to ratify the sale of their undivided interests in the realty, are therefore entitled to recover from defendant the consideration paid for their interest, and therefore judgment for their proportion thereof received by defendants.

On the other hand, the defendants' contentions are principally embodied in their motion to dismiss the case and consist of three propositions: First, that the plaintiffs sue on a joint cause of action, and the evidence and proof show that their interests are separate, distinct, and several; second that the proofs do not establish any trust relationship between the plaintiffs and the defendants; third, that the plaintiffs' testimony shows that defendants conveyed only defendants' interest in the property sold, and not any interest of the plaintiffs therein.

Before considering the claim of the intervener, the First Bank of Cordova, to any portion of the fund in the registry of the court, it would be well to consider the questions raised by counsel for defendants in the principal case, and then, having determined the rights of plaintiffs and defendants, to consider the contention of the intervener as to its right to a banker's lien on certain of the moneys deposited in the bank.

## The First Point Raised by Defendants.

That plaintiffs' complaint alleges a joint interest, while the proofs show a separate interest, in the mining claims, and that

therefore the action must be dismissed. In my opinion, this is not well taken.

Section 1195 of the Compiled Laws of Alaska, relative to parties to equitable actions (which this is conceded to be), provides that:

"All persons having an interest *in the subject of the action* and in obtaining the relief demanded may be joined as plaintiffs, except as in this chapter otherwise provided." (Italics mine.)

Section 1196 provides that:

" * * * Those [parties plaintiff or defendant] who are united in interest must be joined," etc.

This does not necessarily mean that those not united in interest may not be joined as parties plaintiff. It means that, when they have an interest in the subject of an action and in the relief, they may be joined; but, if united in interest, they must be joined, either as plaintiffs or made parties defendant.

"The subject of the action," as used in section 1195, means the subject-matter of the action, and in this case it would be the moneys and property acquired by defendants from the sale of the common property of the defendants, and alleged by plaintiffs to be subject to the imposition of a constructive trust. The plaintiffs have a common interest in the fund, which they seek to subject to a constructive trust in their behalf. As between themselves as tenants in common their interest in the subject-matter of the action is not joint, but several; but each has an interest in the subject-matter of the action and the relief demanded which is common to all. "Any connected parties having a common interest centering in the point in issue in an action may unite." See Comstock v. Rayford, 1 Smedes & M. (Miss.) 423, 40 Am. Dec. 102; Risley v. Utica (C. C.) 173 Fed. 503.

In Watson et al. v. National Life & Trust Co., 162 Fed. 7, 88 C. C. A. 380, the court says (I quote from a syllabus):

"The joining of several complainants in a bill in equity, the purpose of which is to secure an accounting of a trust, in which all of the complainants claim an interest, with others, although their interests are several, does not render such bill multifarious."

In Whitehead v. Sweet, 126 Cal. 67, 58 Pac. 376, the court said:

"On well-understood principles of equity pleading, a bill is not multifarious because the plaintiffs are not entitled to a decree in their favor jontly or in solido. It is sufficient if they are injured in a similar way, that they have common grievances to redress, and that they are entitled to relief of the same kind."

In Pomeroy on Code Remedies, §§ 162, 248, the author says:

"Persons that can be made coplaintiffs in an equity case may be roughly separated into two general classes: First, those whose rights, claims, and interests as against the defendant are joint, not necessarily in the strict technical sense of the common law, but in a broader popular sense; that is, whose interests, claims, and rights, whether legal or equitable, are concurrent, arising out of the same defense, having the same general nature, and entitled to the same sort of relief. * * * And in the second class are found all those persons who are collaterally interested in the subject-matter of the controversy, whose interests and claims, although antagonistic to the defendant (and to that extent therefore in harmony with the real plaintiff), are still separate and distinct in their nature, arising from different facts and circumstances and demanding perhaps a different relief."

Also in paragraph 128 of his Code Remedies (4th Ed.) Mr. Pomeroy says:

"It is certainly settled beyond a doubt that in all equitable actions, and in all actions where upon equitable principles a coplaintiff may sometimes be added, not because he is jointly interested with the other, but because his presence is considered necessary to a complete determination of the issues, the equitable rule applies in its full force, and a misjoinder of plaintiffs is not a defense to a suit. It is neither a ground for a demurrer, nor can it be set up in the answer as a bar to the relief demanded in the complaint of petition. The name of the unnecessary plaintiff may be struck out by the court upon motion, or, if the case proceeds to trial, a judgment may be rendered in favor of the plaintiff entitled thereto, and the action dismissed as to the others."

In 21 Corpus Juris, pp. 308, 309, and notes, the doctrine is further set up that a mere misjoinder of parties plaintiff (or defendant) in a bill in equity is not sufficient cause for dismissal of the bill.

This bill alleges that the plaintiffs were the owners of an undivided $^1/_{16}$ interest in certain claims; while, in effect, the proof tends to show that Djarf and Garwood each claim the legal title to an undivided $^1/_{48}$ interest in certain of the properties under the decree of the court of April, 1911, above re-

6 A.R.—45

ferred to; that the plaintiff Fannie Holman claims the title to an undivided $1/48$ interest through a consolidation of interests with Christian Tjosevig in the year 1907; and that all, by reason of such claims of interest, are seeking to impose a trust upon the fund received by the defendants from the sale of such interest.

They have a common interest in the issues and the relief demanded, and I deem the point raised by defendant insufficient to dismiss the action.

The second point raised by defendant in the motion to dismiss involves the question whether or not, under the facts of the case, an implied trust should, in equity, be imposed on the consideration received from the sale of the whole property by Christian Tjosevig, a tenant in common with the plaintiff.

To determine this question it is necessary to look, not only into the pleadings, but also into the testimony submitted on the trial of the case. The question was primarily raised on the demurrer of defendants to the amended and supplemental complaint of plaintiff. The first cause of action of plaintiff's complaint involved the question whether an implied trust in favor of plaintiff under the facts stated could be imposed on the $4,000 received by Christian Tjosevig and Nels Tjosevig under the contract of April 6, 1916, wherein Christian Tjosevig agreed to sell the property mentioned to one George Francis Rowe for $150,000. This contract was forfeited by reason of the nonperformance of the conditions thereof by George Francis Rowe. A demurrer to the first cause of action was sustained by Judge Jennings for the reason that no possession of the property was ever delivered to the purchaser, and that therefore no implied trust should, in equity, be imposed upon the first payment of $4,000 paid by Rowe to Tjosevig. I fully agree with the ruling of Judge Jennings that the demurrer was well taken as to the first cause of action.

The demurrer to the second and third causes of action of the complaint was overruled by Judge Jennings in the following language:

"In paragraph 5 of both the second and third causes of action it is alleged: 'And that at said time [time of sale by cotenant] the said defendant deeded the possession of all of said mining claims and of every part thereof to the Tjosevig-Kennecott Copper Company, which thereupon went into possession of all of said mining claims and of every part thereof. Plaintiffs expressly ratify and

confirm defendant's said action.' This I think redeems the second and third causes of action, and causes them to be sufficient to confer upon an equity court jurisdiction. 'The cotenant whose interests have been sold and possession of his property delivered by his cotenant has the right either to disaffirm the sale and become a cotenant with the purchaser, or else affirm it, and call upon the seller for an accounting of the proceeds.' 7 R. C. L. p. 897, note 4, and cases cited in said note."

The rule quoted by Judge Jennings from Ruling Case Law, by a majority of the decisions of the United States, is certainly the rule with reference to the sale of chattels by one cotenant of the property of his contenant. The reason for this rule is that the sale is complete upon delivery of possession of personal property, and, as applied to tenants in common, follows the general rule of conversion of any chattel by one not the owner thereof.

In Freeman on Cotenancy and Partition (2d Ed.) par. 308, the reason for the rule with relation to chattels is thus laid down:

"But the rule that a cotenant, selling the whole of a chattel as his own and delivering possession thereof to the purchaser, is responsible to his cotenant in an action of trover, is not enforced merely because it affords a penalty against him for violating the obligations of the joint ownership. It depends upon principles which are equally applicable to ownership in common and to ownership in severalty. Whoever assumes the rights of ownership and the power of disposition over personal property, and carries this assumed authority so far as to dispose of the thing as his own, thereby converts it, and makes himself liable to an action of trover. If, instead of assuming authority over the whole, he assumes it over a part, then the conversion exists as to that part only. It is none the less a conversion of the part, because he who converts may be the owner of another part or interest; and the law does not withhold its remedy merely because the conversion is of an undivided interest, instead of an entirety."

But, in the case of real property, this rule in my opinion does not apply, for to constitute a sale in real property there must be more than a mere delivery of possession. There must be a formal conveyance, executed with the formalities required by law for such transfer. Under certain conditions I have no doubt that a tenant in common might ratify a sale of his interest in realty by his cotenant, and demand an accounting for his share of the proceeds. For example, should his interest be equitable only, and the legal title be conveyed,

or should the vendor assume to act as agent for his cotenant, or sell in his cotenant's name, thus assuming to act as agent, the court would undoubtedly in a proper action establish a constructive trust in behalf of the ratifying cotenant.

Each tenant in common of real property, as well as personal property, is entitled to the possession of the whole estate, and the delivery of the possession of the whole and each and every part of realty by one tenant in common is no trespass on the rights of the other tenant, in the absence of an ouster.

I have given this subject careful consideration, and have examined many authorities, and fail to find any that sustain the broad proposition as applied to realty laid down in 7 R. C. L. at page 897, note 4, except the citation therein referred to. This citation is contained in a note to the case of Cedar Canyon Consolidated Mining Co. v. Yarwood, 91 Am. St. Rep. page 881. This note (c) says:

"One cotenant, as such, has no implied authority to dispose of his cotenant's interest in the common property, and any attempt on his part to dispose of such interest will be void as to his cotenant. * * * Even if he is possessed of express authority to convey the interest of his co-owner, unless his power is mentioned in the conveyance which he makes, it will be deemed to convey only his own interest. Gillet v. Gaffney, 3 Colo. 351. * * * Where one tenant in common does attempt to dispose of his cotenant's interest without authority to do so, the cotenant has two courses open to him. He may treat the attempted sale of his interest as a nullity, and, if the grantee refuses to admit him to possession of the premises, may bring ejectment and recover such possession, or he may, at his election, affirm what has been done, and treat the money received for his interest as money received to his use. In the latter case assumpsit will lie, even in the absence of an express promise. Murley v. Ennis, 2 Colo. 300."

The case of Murley v. Ennis, 2 Colo. 300 (cited as authority for the broad proposition laid down in the note above quoted), does not, in my opinion, bear out the rule set forth therein. That case arose under a prospecting agreement between Murley, on the one part, and Ennis and another, on the other part, by which Murley was to prospect for lodes and mines, and the others were to furnish provisions and other supplies to him, and each party was to have one-third of all locations made by Murley. Murley took possession of a lode claim previously abandoned by others, and sold it to one McAfee.

All this happened prior to the enactment of the present mining law of 1872. 17 Stat. 91. After consideration of the law of agency and mining copartnership, the court, on page 306, says:

"And if one so occupying for himself and another [of a mining lode] afterward avail himself of his sole possession to turn the estate into money, his associate may either bring ejectment against the purchaser for his interest and share in the realty, or may at his election affirm what has been done, and treat the money, or so much thereof as may be proportionate to his interest in the premises, as money received to his use, in which case, even without any express promise, assumpsit will lie therefor."

This statement of a learned judge is based upon the peculiar facts of the case before him, and refers solely to a possessory right to a lode located under the Mining Act of July 26, 1866 (14 Stat. 251, c. 262), under which Murley seems to have taken possession of the lode under local rules and regulations of miners. The court laid stress upon the fact of the mining copartnership agreement and the agency of Murley as a copartner. The facts, which are disclosed by the case, involved a contractual relation between the parties, whereby one, in the development and possession of a mine, was acting as agent of the others, and, in violation of his duty as agent of the copartnership, sold their interest in the lode or mine.

The facts are so different from the general proposition laid down in the note aforesaid to the case referred to that it cannot be regarded as a precedent. Under the circumstances of the case, the principle announced by Judge Wells might well be considered correct. See 3 Lindley on Mines, p. 798; Freeman on Cotenancy and Partition, p. 116; McIntosh v. Perkins, 13 Mont. p. 143, 32 Pac. 653—the reason being that there was a mining copartnership formed to locate and develop mines, and Murley was acting as agent of the others in so doing.

There is also cited in the same note the case of Milton v. Hogue, 39 N. C. 415. The facts in this case were that Hogue was a tenant in common with Milton in a tract of land, they both being heirs of a common ancestor. A valuable mine of gold had been discovered thereon. Hogue sold the whole property, including the share of his cotenant, without any authorization from the latter to sell, or an agreement after sale that they should confirm. The plaintiff, Milton, brought an

action against Hogue, seeking to have the defendant, Hogue, declared trustee to the amount of her proportion of the sale price. In deciding the case against the plaintiff on the proposition, the court said:

"Without a contract between the parties, the sale of the whole tract of land and receipt of the price by one tenant in common does not turn him into a trustee for a cotenant, as the latter still has the legal title to his own share, and can have redress on it at law. It is not like the sale by one of the personal property of another, in which case the owner may waive the tort and treat it as a sale made for him, and recover the price as money had and received to his use, because the property passes by parol. But it is otherwise in respect to land; for that can pass only by deed, and the purchaser may refuse to accept it."

In the case of Stephen v. Beall, 22 Wall. 329, 22 L. Ed. 786, the Supreme Court of the United States announces the principle that an attempted conveyance of the entire property by one tenant in common can have no effect on the interests of his co-owners, without their acquiescence or consent.

In the case of Gaines v. Lizardi et al., 1 Woods, 56, Fed. Cas. No. 5,174, Mr. Justice Bradley, sitting as Circuit Judge, notes the same distinction between personal property and real estate. The matter arose in this case on a mandate from the Supreme Court of the United States in the celebrated Gaines-New Orleans Cases, upon a motion to enter a decree pursuant to a mandate. In his opinion Mr. Justice Bradley says:

"Some questions, however, have been raised, which it is necessary now to determine:

"First, the complainant [Myra Clark Gaines] claims a decree, not only for the lands of which the several defendants were possessed at the time of filing the bills respectively, but for the proceeds of lands formerly belonging to Daniel Clark, which the defendants had previously possessed and sold before the filing of said bills. She claims to hold the defendants as trustees for her of the lands thus previously disposed of, and elects to receive the purchase money, instead of following the lands themselves.

"This claim, I think, is untenable. The claim of the defendants is adverse to that of the complainant. There is no privity between them. They stand and have always stood at arm's length. The defendants claimed the lands to be theirs by one title; she claimed them to be hers by another. There is no privity or trusteeship between them. Had the defendants, by any fraudulent practice, or by the fraudulent practice of their grantors or predecessors (known to them), procured the legal title to the lands, then they might have been held as trustees, and if they had disposed of the same, espe-

cially to innocent purchasers, might have been made to respond for the proceeds thereof. In such case the lands themselves might have been placed beyond the complainant's reach, and the proceeds might have been the only fund to which the complainant could resort. But in the present case the defendants never acquired the title of the complainant, nor legal title at all, but a spurious title; and their conveyance of the lands has transferred no title to the vendees; but the lands still remain subject to the complainant's title and are recoverable by her in whosesoever hands they may be. The conveyance thereof by the defendants to third parties has not in the slightest degree had the effect to place any barriers or obstacles in the way of the complainant to their recovery. Her title remains perfect and unimpaired. Had the legal title been transferred, though subject to her right to avoid it, her election to take the proceeds would have confirmed that title in the possessor, and her remedy would have been exhausted. But her election in the present case does not extinguish her title to the lands. Being the legal title, it remains valid; and a further act on her part, by way of release or other conveyance, in addition to the act of election, would be necessary to effectuate justice. And to whom should such release or conveyance be made? The persons that would have been entitled therein have not been made parties to the suit; and the court does not know who they are, and can give no directions on the subject. And if they had been made parties, the difficulty would not have been surmounted; because they can never be converted into trustees for her by claiming a title paramount to hers without any actual fraud on their part.

"The cases in which a person entitled to the possession of personal property has been allowed to waive his right to the specific property, or to damages for its detention, and to sue the wrongful appropriator thereof for the price of it, as upon a sale, do not bear upon the point in question. For a recovery, either of damages for the detention or of the price as for a sale, changes the title of the property, and is itself an election to have the money instead."

While this case does not turn upon the mutual obligations of tenants in common, in my opinion its reasoning is peculiarly applicable to the contentions of the plaintiffs Djarf and Garwood in the present case. The attempt to sell their interest in the common property by Tjosevig did not affect their title thereto. Any attempt by Tjosevig to sell such property (the legal title being in them) would be a nullity, and for that reason the comments of Justice Bradley are peculiarly applicable to the case at bar. It is elementary that no agency is implied from the relation of tenants in common in realty, and hence as between Djarf and Garwood and Tjosevig there were no contractual relations.

A constructive trust is that species of implied trusts that arise by operation or construction of law out of fraudulent acts or declarations of persons who in some sense sustain a fiduciary relation.  As was said in 3 Pomeroy on Equity, par. 1044:

"An exhaustive analysis would show, I think, that all instances of constructive trusts, properly so called, may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source.  Even in that single class where equity proceeds upon the maxim that an intention to fulfill an obligation should be imputed, and assumes that the purchaser intended to act in pursuance of his fiduciary duty, the notion of fraud is not invoked, because it is not absolutely necessary under the circumstances; the existence of the trust in all cases of this class might be referred to constructive fraud.  This notion of fraud enters into the conception in all its possible degrees.  Certain species of the constructive trusts arise from actual fraud; many others spring from the violation of some fiduciary obligation; in all the remaining instances there is, latent perhaps, but none the less real, the necessary element of that unconscientious conduct which equity calls constructive fraud."

The plaintiffs in the case at bar in their pleadings allege that at the time of the sale of their interest in the property referred to and prior thereto—

"defendants, with intent to defraud plaintiffs of the rights therein, wholly disregarded and refused to recognize plaintiffs' rights therein, and represented to the purchasers that the defendants were the owners of and entitled to the possession of the whole of said undivided 24½/48 interest in and to all of said mining claims."

The testimony shows conclusively that Djarf and Garwood were each the owners of an undivided $1/48$ interest in certain of the mining claims sold by defendant Christian Tjosevig to the Tjosevig-Kennecott Copper Company; that Tjosevig at the time of the sale claimed to be the owner of such claims by virtue of his forfeiture proceedings under section 2324, Revised Statutes of the United States.  This claim seems to have been made by Tjosevig in good faith, and the agent of the Copper Company, the purchaser (one Rowe), seems to have been apprised of the claim of Tjosevig to the Djarf and Garwood interests through the forfeiture proceedings aforesaid. Not until the decision by Judge Jennings in the case of Dono-

hoe and Smith v. Tjosevig was the validity of the forfeiture proceedings impeached.

From the time of the maturity of such proceedings up to the decision in the Donohoe-Smith Case, Tjosevig did not recognize the plaintiffs Djarf and Garwood as cotenants in any of the mining claims. The right of Tjosevig to forfeit his cotenants' interest therein for noncontribution towards annual labor was a statutory right, and his exercise thereof and claim of interest by virtue thereof cannot under any view of the law be considered actual or constructive fraud against his cotenants. Nor was there any fiduciary relation existing between the Tjosevigs and the plaintiffs Djarf and Garwood; in fact, it appears that the relations were the reverse, as Tjosevig appears to have been claiming (subsequent to the forfeiture procedings) adversely to plaintiffs.

Under the law and under the facts, in my judgment, the plaintiffs Djarf and Garwood have no cause of action against the defendant, and certainly they have not under the allegations of the complaint.

The claim of Fannie Holman stands upon a different footing than that of the other plaintiffs. It appears from the testimony of Andrew Holman—which is not disputed by the defendant—that he became interested with Christian Tjosevig in mining claims in the year 1905; that he owned some claims at the head of Copper river in the Valdez district, Alaska, and that Christian Tjosevig owned some claims in the Chitina district; that he traded one of his claims for a half interest in one of Tjosevig's claims. Afterwards there was an adjustment, and this one-half which he owned was put in with some other claims owned by Tjosevig, and under the terms of the adjustment a $1/18$ interest was conveyed by Tjosevig to Holman in the nine claims of the "Norway group," comprising the Norway No. 1, Little Bonanza, Bulldog, Ruben, Magpie, Eli, Bekka, Nebraska, and Norway No. 2 lode claims. A certified copy of the deed of this $1/18$ interest from Tjosevig to Holman, dated April 4, 1905, and recorded September 15, 1905, was introduced in evidence in connection with the Holman deposition. Holman further testified that he was acquainted with the claims described in the deed from the Tjosevigs to the Tjosevig-Kennecott Copper Company, dated

June 16, 1916, except the placer claims; that he owned an undivided $^1/_{48}$ interest in the claims enumerated in the certain declaration of trust given by Christian Tjosevig to him on March 25, 1907. This declaration of trust is attached to the deposition of Fannie Holman, to whom he (Andrew Holman) had transferred his interest thereunder. He further testified that be became the owner of the $^1/_{48}$ interest in the claims described through a trade with Tjosevig; that he was interested in some of the claims with Tjosevig, and they had a readjustment and consolidation of interest, and the several interests were proportioned in the whole group as consolidated; that the names of the claims consolidated, in which he had an interest, were described in the declaration of trust. This declaration of trust, made by Christian Tjosevig and testified to by Andrew Holman, is as follows:

"To A. L. Levy & Co., Valdez, Alaska:

"Whereas, on the 19th day of February, 1907, Christian Tjosevig, of Valdez, Alaska, has granted to George C. Hazelet, trustee, an option to purchase the following named mining claims, situated and recorded in the Valdez recording precinct, Alaska, viz. Charlotte, Teddy, June No. 1, June No. 2, Eli, Bekka, Nebraska, Norway No. 2, Tjosevig No. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15, also, an undivided one-half interest in Norway, Bulldog, Little Bonanza, upon the terms and conditions therein stated, and upon the following payments, to be made at the time and in the manner following, to wit: $3,000 on or before October 1, 1907, and $15,000 annually thereafter (at the option of the party of the second part, who reserves the right to forfeit the said option), it being provided in said option that upon the completion of the railroad named and described in said option, within one year thereafter, the one-half of the remaining purchase price of said claims, shall be paid, and the balance within two years from the completion of said railroad.

"The full purchase price of said claims is stated to be $350,000, and the said option agreement and a deed to said property is deposited with A. L. Levy & Co., bankers, in escrow, subject to the foregoing payments and conditions.

"And whereas, Andrew Holman, of Valdez, Alaska, is the owner of an undivided one forty-eighth interest in and to said mining claims, and is entitled to receive such proportion of the said purchase price to be paid under said option:

"Now you, the said A. L. Levy & Co., bankers, holding said escrow deed and option, are hereby authorized and directed to deposit to the credit of the said Andrew Holman one forty-eighth of any and all sums of money paid to you for or on account of said option agreement and deed, so held by you in escrow, and I

do hereby acknowledge that the said Andrew Holman owns an undivided one forty-eighth interest in and to said mining claims.

"Witness my hand and seal this March 25, 1907.

"Christian Tjosevig.  [Seal.]

"In presence of:

"Jno. Y. Ostrander,

"Gust. Max Esterly."

Holman further testified that he executed a power of attorney to Christian Tjosevig, authorizing him to sell his $1/_{18}$ interest in the Norway group, and refers to a certified copy of such power attached to his deposition. This power of attorney was dated March 2, 1907, and authorized Tjosevig to sell Holman's interest in the nine claims known as the "Norway group," together with a claim known as the Bear Lode claim. It will be noted that the date of this power of attorney was March 2, 1907, and the same was executed some time before the declaration of trust by Tjosevig above set forth, in which Tjosevig certifies that Holman is the owner of a $1/_{48}$ interest in certain claims other than those included in the Norway group. It nowhere appears in the testimony that there was a conveyance of this $1/_{48}$ interest declared by Tjosevig to be vested in Holman from Tjosevig to Holman, but the only evidence of the title of Holman as to this $1/_{48}$ interest is the declaration of trust made by Tjosevig on March 25, 1907, and the inference is that Tjosevig was holding the legal title to such interest in his own name for the purpose of sale in pursuance of the option given to George C. Hazelet, mentioned in the declaration of trust. This inference is borne out by the fact that Holman in making the transfer of his $1/_{48}$ interest in the claim to his wife, instead of making a deed of conveyance conveying such interest, simply assigned the declaration of trust and the interest therein specified. This inference is further supported by the complaint of Fannie Holman in the action of Holman v. Tjosevig filed in the district court at Valdez on January 20, 1917, for therein the prayer was that the defendant Christian Tjosevig be ordered and directed to issue to her a deed for the $1/_{48}$ interest claimed by her in the mining claims sold by Christian Tjosevig to the Tjosevig-Kennecott Copper Company on June 6, 1916.

I am of the opinion, therefore, that on March 25, 1907, and thereafter, the defendant Christian Tjosevig was holding the $1/_{48}$ interest of Fannie Holman in the mining claims sold

to the Tjosevig-Kennecott Copper Company in trust for the benefit of Andrew Holman and his successor in interest, Fannie Holman. Such being in my opinion the fact as to the claim of interest by Fannie Holman in the property sold by Christian Tjosevig to the Kennecott Copper Company, it naturally follows that in equity and good conscience Tjosevig should account to her for her proportion of the consideration received.

But Tjosevig claims that in 1911 he, under authority from Andrew Holman, disposed of this $1/48$ interest to Andrew Halvorsen. This authority, he states in his testimony, he had by a power of attorney; but, on being questioned where the power of attorney was, he stated that he did not know, nor did he know whether or not the power of attorney dated March 2, 1907, was the power under which he claimed authority to convey the property. Holman explains the giving of the power of attorney by saying that George C. Hazelet wanted an option on the claims in which Holman had a $1/18$ interest, and the power of attorney was given to make the conveyance pursuant to an option on the $1/18$ interest of Holman then of record in the 10 claims referred to in the conveyance from Tjosevig to Holman; that after such option was given a readjustment of interests was made, and the interest of Holman became a $1/48$ interest in all of the claims optioned to Hazelet, as evidenced by Tjosevig's declaration of trust to him on March 25, 1907. Therefore the authority to Tjosevig was to convey the Holman $1/18$ interest in the certain claims known as the "Norway group" (the legal title to which was in Holman), and not to convey his $1/48$ interest in the 24 claims acquired on the readjustment of March 25, 1907. There being no power or authority in Tjosevig to convey the $1/48$ interest to Halvorsen, therefore Halvorsen did not acquire the Holman interest in the group of claims specified in the trust declaration.

Holman further testified that, after the sale to the Copper Company had been consummated, he met Tjosevig at the train in Montana and had a conversation with him. Tjosevig stated to him that, as Holman had not done his assessment work, he (Tjosevig) had advertised him out, and that Holman had no further interest in the claim. He promised to talk with him later, and said that something might be done in the mat-

ter, and at the time of parting Tjosevig left $60 in Holman's hands.

Tjosevig does not deny this conversation, but admits meeting Holman at the train. His statement as to Holman's interest was false, as no proceedings appear to have been taken for the forfeiture of Holman's interest in the claims. It further appears from the evidence that the assignment of Holman's equitable $1/48$ interest in the claims mentioned in the declaration of trust was made by Holman to his wife, Fannie Holman, on March 25, 1907, and recorded at Valdez, Alaska, on March 26, 1907. Halvorsen, therefore, must have had constructive notice of this assignment, and cannot be in the position of an innocent purchaser of the Holman interest for two reasons: First, because no authority was vested in Tjosevig to convey the $1/48$ interest belonging to Holman; and, second, he had constructive notice of the conveyance to Fannie Holman of date of March 25, 1907. Halvorsen is therefore bound by the trust agreement of Tjosevig, and the cestui que trust, Fannie Holman, can follow the property and the proceeds thereof in his (Halvorsen's) hands.

Counsel for defendants urged that Fannie Holman had never affirmed the sale of her interest, and referred to the action brought by her in January, 1917, as an election to the contrary. An examination of the complaint in this action shows that the purpose of the action was for a decree confirming her $1/48$ interest in the property sold by Christian Tjosevig, for a deed therefor, and that her title be declared superior to that of the Tjosevig-Kennecott Copper Company. It further appears that this action was not pressed after being brought by her attorneys, and was afterwards dismissed. As to the affirmance of the sale, I think that the bringing of this action to a final judgment concludes all questions on that point, even if her testimony, which is to the effect that she is satisfied with the sale, is not determinative thereof.

A further point is that, by the judgment in the case of Donohoe and Smith v. Tjosevig et al., the defendants were compelled to pay $7\frac{1}{2}$ per cent. of the $3/48$ interest belonging to Djarf, Garwood, and Holman, and that it would be inequitable to require the Tjosevigs to pay again any portion of that sum to the plaintiffs in this case. It is true that by the decree in the Donohoe-Smith case that $7\frac{1}{2}$ per cent. of the

$^3/_{48}$ interests of Holman, Hazelet, and Ekomo were directed to be paid to Donohoe and Smith. The fault for this lies, not with the court, but with both the defendant and the plaintiff Holman herein. If defendant had raised the question in the pleadings in the Donohoe-Smith case, and had these plaintiffs been brought into that action, after this plaintiff's claim to a $^1/_{48}$ interest had been asserted, it would have been considered by the court in making its final award of the amount due Donohoe and Smith; or, if these plaintiffs, the Holmans in this case, had acted promptly during that action, and intervened for their proportion of the fund, the whole controversy might have been equitably determined. In that case it appears that the plaintiff, Fannie Holman, was in January, 1917, notified of the sale of the property, and sought redress by a method afterwards abandoned, and not until September 8, 1918 (after the case of Donohoe and Smith had been tried), did she bring this action. I am of the opinion that by reason of her laches she should suffer the loss, and that out of any judgment she may obtain herein 7½ per cent. of such amount should be deducted from the amount to be paid by Christian Tjosevig and Andrew Halvorsen.

A further question is raised by counsel for the defendant, that, in the case of Donohoe and Smith v. Tjosevig et al., Judge Jennings, in findings 19 and 20 (pages 679, 680, of the printed record), found as a fact that the Tjosevigs and Halvorsen were the owners of the Holman interest, and that Fannie Holman, being a party to that suit by reason of her intervention therein, is precluded from maintaining this action.

I do not consider this position of counsel tenable: First, because Fannie Holman was not in fact a party to the intervention in the Donahoe-Smith Case. The complaint in intervention in that case was brought in the names of Andrew Holman, Djarf, and Garwood. Second, the complaint shows that the intervention was solely for the purpose of continuing an injunction against the disposal by the bank of the moneys in excess of what might be required to satisfy the claim of Djarf and Garwood in that case, and there was no issue tendered upon the merits of the claim of the plaintiffs herein. Third, the complaint in intervention was not filed until long after the principal case was filed and submitted to the court. There was no issue tendered or tried in that case be-

fore the court upon the cause of action in this. The position of counsel that the issue herein is res adjudicata cannot be upheld. See Davis v. Brown, 94 U. S. 423, 24 L. Ed. 204; Freeman on Judgments, par. 252 et seq.

I am convinced from the testimony herein that Fannie Holman stands logically in the same position towards Christian Tjosevig and the fund derived from the sale of her $1/48$ interest in the mining claims referred to as did Donohoe and Smith from the sale of their $7\frac{1}{2}$ per cent. interest by Tjosevig, and that under the authority of the case of Tjosevig et al. v. Donohoe et al., 262 Fed. 911, a decree should be awarded in her favor for her proportion of the proceeds of the sale made by Tjosevig to the Tjosevig-Kennecott Copper Company. Tjosevig was trustee for Fannie Holman under a written express declaration of trust, as he was trustee for Donohoe and Smith. He held her title to the claims, as he held their title, in his own name, and disposed of it as his own, and therefore he must account for the proceeds to her, as he was required to account to them.

A further question is raised, that certain claims, known as the Carbonate Hill, Contact lode, the Consolidated placer claim, and the Dagny Marie lode, sold by Tjosevig, were not included in the declaration of trust to Andrew Holman, and that the court cannot, under the circumstances, determine the amount to be awarded to her. This is the same claim made by the defendants in the trial of the Donohoe-Smith Case, and I think that the conclusions of Judge Jennings on this point cannot be gainsaid. The value of the placer claim and the several quartz claims cannot be considered as reducing the trust fund, because their value is undetermined and undeterminable. The authorities are, where a trustee so mingles the trust fund or property with his own, or so invests it in property with his own that the trust fund or property cannot be separated or ascertained, the whole mixed fund or property becomes subject to the trust, except so far as the trustee may be able to distinguish or separate his own fund or property; the burden of such distinction or separation being on the trustee. 39 Cyc. 538.

As to the third point of counsel for defendant in his motion to dismiss, that Tjosevig did not sell the interest of plaintiff, I think it is disposed of as far as Fannie Holman's $1/48$ in-

terest is concerned by the case of Donohoe et al. v. Tjosevig et al. The reasoning of the Circuit Court of Appeals in that case is conclusive in this as to the sale of her interest.

As to the third cause of action, for damages for nondelivery of the stock of the Tjosevig-Kennecott Copper Company, which, under the contract, Tjosevig was to have received, it appears that Christian Tjosevig has never received any portion of the same, and has never been in a position to account to his cestui que trust therefor; hence, he is not subject to an action for damages for nondelivery thereof.

Therefore, under the authority of Donohoe et al. v. Tjosevig et al., I am convinced that the plaintiff, Fannie Holman, is entitled to a decree as prayed for against the defendants Christian Tjosevig and Andrew Halvorsen to the extent of her $1/48$ interest in the property disposed of by Christian Tjosevig; that she should also be entitled to a $1/48$ interest in the 125,000 shares of stock *when* delivered to Christian Tjosevig.

As to the plaintiffs Djarf and Garwood, I am of the opinion that they have no cause of action against the defendant Christian Tjosevig, and that the case should be dismissed as to them.

The First Bank of Cordova was made a party to the action by the plaintiffs, and was a necessary party thereto, because an injunction was sought restraining the bank from paying out any portion of the $17,000 in excess of the amount that might become due Donohoe and Smith in the case of Donohoe and Smith v. Tjosevig et al.

In answering the complaint, the bank, by its affirmative answer, claimed an equitable right of set-off in the nature of a banker's lien against the fund in the registry of the court, to the extent of the amount due on a joint and promissory note executed by one Ole Berg and Christian Tjosevig for the sum of $5,000 and interest at 12 per cent., dated September 17, 1918, payable to the bank 90 days after date. The bank claims, further, that there is due it on said promissory note the sum of $3,000 and interest at the rate of 12 per cent. from January 9, 1919, and in which amount, with the claim for attorney fees in the sum of $350, it prays a judgment against the defendants.

The basis of the claim of the bank is set forth in the testimony of Malcolm Brock, president and manager of the bank from 1916 to 1918. It appears therefrom that on June 6, 1916, under the agreement heretofore quoted above, Christian, Eli, and Nels Tjosevig, on the one part, and the bank, on the other, became trustees for the first parties to receive and authorize the transfer of the shares of stock in the Copper Company as sold, and, on receipt of the money therefor, to dispose of the money so received (after the payment of $2,000 to Nels Tjosevig) in the proportion of one-third to Nels Tjosevig and two-thirds to Christian Tjosevig, and, when the sum of $175,000 was received, to deliver to Christian Tjosevig 125,000 shares of stock and to Nels Tjosevig 10,000 shares.

Between June 6, 1916, and March 6, 1917, the full sum of $175,000 had been received by the bank from sales of stock of the Copper Company, and $117,000 was placed to the credit of Christian Tjosevig, and $58,000 to the credit of Nels Tjosevig, in accordance with the terms of the trust agreement. The credit of Christian Tjosevig was carried in a general deposit account in the bank subject to check by Christian Tjosevig. In the meantime the action of Donohoe and Smith v. Tjosevig et al. had been commenced, and on December 30, 1916, a restraining order, pendente lite, was issued by the court, enjoining the bank from paying over to the defendants any moneys coming into its hands from the sale of the properties mentioned.

On March 20, 1917, this restraining order was modified, and the bank was authorized to pay defendants any sum in excess of $17,000; but the bank was directed to retain in its possession, under this and previous orders, the sum of $17,000, to await the final determination of the action.

Under the entry of this last order, the bank transferred the sum of $17,000 from the general deposit account of Christian Tjosevig to defendant's savings bank account. Whether this savings bank account was carried in the name of Christian Tjosevig, or as being under the court order, does not appear from the testimony.

Christian Tjosevig's account was closed on August 29, 1917, and he appears to have had no general deposit with the bank subsequent to that date, and at no time was there any account in the bank with either Eli Tjosevig or Andrew Halvorsen.

6 A.R.—46

According to Brock's testimony prior to September 17, 1918, one Ole Berg, superintendent of the North Midas Copper Company, sought a loan of $5,000 from the bank, offering to secure the bank with capital stock of the North Midas Company; but the loan was declined. Berg then asked whether, if Christian Tjosevig would go on the note, the loan would be entertained. Mr. Brock testifies:

"Thereafter Mr. Christian Tjosevig saw me, and wanted to know if I would make a loan to Mr. Berg and himself for $5,000, and I said to him, 'What security will you give me?' He said he had something over $17,000 on deposit in the bank, and that 'ought to be sufficient for a loan of $5,000.' I said, 'Yes, it would be, if it were intact,' but that we had been served with an injunctional order by the court not to pay out this money pending the determination of a suit brought against him by T. J. Donohoe and Edmund Smith, and that he had no authority over this money. He said they would not recover all this amount in any event, and when I asked him what, in his judgment, they would recover, he said not over $7,000 or $8,000. I told him, then, that with the understanding that the money remaining in the bank after such judgment might be secured, or all of it, if no judgment were secured, was put up as security for this loan, that I would make it as requested. He assented to this, and the loan was thereupon made."

It further appears that Brock, prior to the consummation of the loan of September 17, 1918, made inquiry from T. J. Donohoe as to the amount necessary to satisfy the claim of plaintiffs in the Donohoe-Smith Case, and was informed that the amount would be approximately $12,000.

Christian Tjosevig strenuously denies any agreement or conversation such as detailed by Brock, although he stated that in the afternoon, Berg, his comaker on the note, asked him if he would go on the note, and he declined, saying he could not. So Berg left, and about 7 or 8 o'clock, Berg came back to the hotel, and he had Brock, the president and manager of the First Bank of Cordova, with him. They came into the room, and Brock did all the talking. He said:

" * * * That Ole [Berg] was in need of money to finish up before freezing, and the bank, or the Blum store, which belonged to the same concern, had advanced the company $6,000 or $7,000, and they couldn't very well advance more money from the bank without his note, and have an indorser, and he asked me if I would go on the note. He said it was just a matter of bank formality. The company and Berg had been in a pinch before, and always made good. * * * I don't think Ole is in a position to give a mort-

gage on the property, but he will put up 50,000 shares of stock as collateral, and I will see that this note is taken care of, and there will be no liability on your part. So I said, 'All right; I will help you.' Later on, a little better than two weeks, I hadn't signed the note. Mr. Brock called to me across the street, and asked me to come up and indorse the note. He said that he had already paid out a lot of money against that note, and that I had promised to indorse it, and so I says, 'All right.' I walked over to the bank. Scott, the cashier, handed the note out and asked me to sign it. He showed me where to indorse it, and I did."

Thus there is a direct and irreconcilable conflict between the testimony of Brock and Tjosevig on the question of whether or not the latter sought to pledge any residue of the fund of $17,000 after the payment of the Donohoe-Smith claim. Brock testifies that Tjosevig assented to the arrangement detailed by him. His statement is rather general as to the time and place, and what was said by Tjosevig in the conversation detailed. Tjosevig, on the other hand, in his testimony gives a detailed statement of what occurred between them. He says that he did not sign the note until some two weeks after the conversation, when Brock called to him across the street and asked him to do so, while Brock's statement would lead to the inference that it was executed immediately after the conversation, except that, in his cross-examination, Brock testifies that the note was not signed by Tjosevig until after the 50,000 shares of stock of the Midas Copper Company had been deposited in the bank as security for Tjosevig.

A significant fact in this whole transaction is that Ole Berg, the principal debtor and the maker of the note, and the one who negotiated the loan and sought Tjosevig's indorsement of the note, and whom Tjosevig testifies was present at the hotel with Brock during the conversation leading up to his agreement to sign the note, was not called as a witness by either party, nor was the lack of his testimony explained. Taking it all in all, as the burden is on the bank to show that there was a pledge of any portion of this money, I am of the opinion that the bank has not by a fair preponderance of evidence shown that Tjosevig pledged any portion of the $17,000 as security for the note. I am further of the opinion that Tjosevig was not at any time in position to pledge any portion of the fund; nor was the bank in a position to accept the pledge of any portion thereof.

In February, 1918 (some eight months before the note trans-action), Tjosevig, in his answer in the Donohoe-Smith Case, alleged that the whole of the fund of $17,000 was the proper-ty of Andrew Halvorsen, under an arrangement theretofore made between them. On the trial of that action, both Tjose-vig and Halvorsen testified to the same effect. It is incon-ceivable, after so strenuously maintaining such a defense, and while the decision of the trial court was still pending on that point in the case of Donohoe et al. v. Tjosevig et al., that the defendant Tjosevig would, for a third party's benefit, so at-tempt to pledge any portion of a fund in which he had under oath disclaimed any interest.

As far as the bank is concerned, the fund of $17,000 had been set aside by the order of the court to await the final de-termination of the case of Donohoe et al. v. Tjosevig et al. The injunctional process of the court had directed that the whole of the fund be held to await the further orders of the court, and the bank, after the service of such order, held the fund and the whole thereof as a qualified bailee, subject to the direction of the court. The bank could not dispose of it, or place any lien or claim on it, or any part of it, except with the permission of the court; and, further, in pursuance of the court's order, it had taken the fund from the general deposit account of Tjosevig and placed it in a special fund in his savings bank account. The most that can be said for the agreement between Tjosevig and Brock (if we admit such an agreement) is that it was an agreement or pledge contingent upon the release of any part thereof from sequestration by the court. It could not be a pledge of the fund, because no de-livery was made by the pledgor, and thus it could not be more than an agreement to pledge the fund, or a part thereof, contingent upon a release thereof by the court.

The bank, however, further contends that it has a banker's lien on the fund, or, as many well-considered authorities put it, "the right of equitable set-off" against the fund in satis-faction of its debt; while, on the other hand, the defendants claim that it was holding the fund as trustee for them under the order of the court, as well as under the original trust agreement of June 6, 1916. Undoubtedly the general rule is that a banker's lien on the moneys and securities deposited in the usual course of business, for advances that are supposed

to be made on their credit, ordinarily attaches, not only against the customer, but against the unknown equities of all others in interest, unless it be modified or waived by some agreement, express or implied, or by conduct inconsistent with its assertion; but it cannot prevail against the equities of the beneficial owners of which the banker had actual or constructive notice. National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693; Reynes v. Dumont, 130 U. S. 354, 9 Sup. Ct. 486, 32 L. Ed. 934; Kendrick State Bank v. Portland First National, 213 Fed. 610, 130 C. C. A. 202.

Were this a case where, in the ordinary course of business, a deposit of money was made by a customer, and he became indebted to the bank, I would have no hesitancy in upholding the bank's claim. But this case is clouded from its inception on this point. In the beginning, the bank acted as trustee, not only for Christian Tjosevig, but also for Eli Tjosevig and Andrew Halvorsen, for the collection and deposit of the fund. It must have had notice from this that the three parties for whom it was acting as trustee were interested in the fund collected from the sale of the property, although after the collection, under the trust agreement, the fund was to be deposited in the name of Christian Tjosevig.

An action was brought, and $17,000 of the fund was sequestrated by the court, and directed to be held to abide the final decision of the court. The bank was a party in that action, as well as custodian of the fund. In that action one of the principal issues between plaintiffs and defendants was the ownership of the fund of which the bank was custodian, and in that case Tjosevig (against whom the right of set-off is claimed by the bank) denied under oath any interest in the fund, and averred that Andrew Halvorsen was the actual and beneficial owner thereof. All this occurred months before any indebtedness was incurred by Tjosevig to the bank, then a party to the action, as well as custodian of the fund under the order of the court. In my opinion, the bank was chargeable with notice of the claim of Halvorsen to the fund, and the duty was imposed upon it to make due inquiry as to the status of the fund before making a loan on the faith of the ownership by Tjosevig of it, or seeking to impose a lien on it.

The further fact is apparent that, after the restraining order of the court, any power of disposal of any part of the

fund by Tjosevig became dormant, and could not be revived unless by the order of the court. From the time of the service of the order sequestrating the fund, it was not a deposit in the usual course of business by Tjosevig, but it was in the nature of a special fund held to await the order of the court. Such being the status of the fund at the time of the execution of the note, a right of set-off or banker's lien did not lie.

I am of the opinion that the claim of the First Bank of Cordova to any portion of the fund must be denied.

Let findings be prepared accordingly.

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes